**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

INCORPORATED VILLAGE OF GARDEN CITY,

                 Plaintiff,

  **-against-**

THE 3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING CO.); DYNEON LLC; E.I. DUPONT DE NEMOURS AND COMPANY; and THE CHEMOURS COMPANY,

                 Defendants.

**Complaint for a Civil Case**

Case No. 19-cv-4612

Jury Trial Demanded

## Table of Contents

I.     **Introduction** ................................................................................................ 1

II.    **Parties** ......................................................................................................... 2

III.   **Jurisdiction and Venue** ............................................................................ 5

IV.   **Factual Allegations** ................................................................................... 5

     A.    PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory
           Standards .............................................................................................. 5

     B.    Defendants' Production of PFAS Products .......................................... 8

     C.    Defendants' Knowledge of Threats Posed by Their PFAS Products ......... 9

     D.    Major Sources of PFAS in the Environment ...................................... 13

     E.    The Village is Injured. ....................................................................... 14

     F.    Treatment of PFAS ............................................................................ 15

     G.    Illegal Transfers Between the DuPont Defendants ............................ 15

V.     **Causes of Action** ..................................................................................... 18

     FIRST CAUSE OF ACTION
     Strict Products Liability for Defective Design ...................................... 18

     SECOND CAUSE OF ACTION
     Strict Products Liability for Failure to Warn ........................................ 21

     THIRD CAUSE OF ACTION
     Negligence .............................................................................................. 23

     FOURTH CAUSE OF ACTION
     Public Nuisance ...................................................................................... 24

     FIFTH CAUSE OF ACTION
     Trespass .................................................................................................. 25

     SIXTH CAUSE OF ACTION
     Fraudulent Conveyance—Violation of New York's Debtor & Creditor Law ............ 27

VI.   **Prayer for Relief** ..................................................................................... 30

VII.   **Demand for Jury Trial** ........................................................................... 30

## I.    Introduction

1.      Plaintiff Incorporated Village of Garden City ("the Village," or "Plaintiff") is a public drinking water provider serving approximately 22,000 residents and businesses in Nassau County, New York. The Village brings this action to recover the substantial costs necessary to protect the public and restore its damaged drinking water supply wells, which are contaminated with toxic per- and poly-fluoroalkyl substances ("PFAS"), including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"), from Defendants' products.[1]

2.      Defendants 3M Company, Dyneon LLC, E.I. DuPont de Nemours and Company, and The Chemours Company (collectively, "Defendants"), manufactured, marketed, sold, and/or promoted PFOA, PFOS, and other PFAS; products containing PFAS; and/or products that degrade to PFOA, PFOS, or other PFAS upon release to the environment. Herein, Defendants' products are collectively referred to as "PFAS Products," and include, but are not limited to, fluoropolymers, coatings, and consumer products.

3.      PFAS are toxic, not easily biodegradable, persistent in the environment, and pose a significant risk to human health and safety. PFAS are associated with a variety of illnesses, including cancer, and considered particularly dangerous to pregnant women and young children.

4.      Defendants knew or should have known that PFAS are highly soluble in water; extremely mobile; persistent; very likely to contaminate surface and groundwater, including drinking supplies; and present significant risks to human health and welfare if released to the environment.

---

[1] As used herein, the term "PFAS" refers to those PFAS the District has detected in its wells. The Village reserves its right to bring additional claims should it incur injuries attributable to the presence of other PFAS in its wells.

5.      Nonetheless, Defendants manufactured, marketed, sold, and/or promoted their PFAS Products to industrial facilities and consumers in New York, with the knowledge that those compounds would be discharged to the land and water in New York as a waste product of certain industrial manufacturing processes, and/or during normal use and disposal of such products, among other normal and foreseeable uses.

6.      The Village files this lawsuit to recover compensatory damages and all other remedies, including but not limited to all necessary funds to reimburse the Village for the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA and PFOS from its drinking water wells, and all associated costs, and to ensure that the parties responsible for the drinking water contamination bear these expenses, rather than the Village and its ratepayers.

## II.    Parties

7.      **Plaintiff Incorporated Village of Garden City** is a public drinking water provider that serves a population of 22,000 throughout its service area in Nassau County, New York.

8.      The Village currently operates ten municipal supply wells distributed throughout its service area.

9.      Seven of the Village's ten wells are already contaminated with PFOA and/or PFOS. PFOA and PFOS are spreading throughout the aquifer system from which the Village draws its drinking water supply, further threatening the Village's already-contaminated wells and as-yet uncontaminated wells.

10.     The Village has a duty to exercise due care and diligence in the maintenance and supervision of its public water system to prevent its pollution and depletion pursuant to 10 NYCRR § 5-1.71.

11.     The Village has a duty to exercise due care and diligence in the maintenance and supervision of its public water system to ensure the protection of the public health pursuant to 10 NYCRR § 5-1.51.

12.     In carrying out its powers, duties, and responsibilities, the Village acts in all respects for the benefit of the people of the Incorporated Village of Garden City and the State of New York, for the protection of their health, welfare, and prosperity.

13.     **Defendant 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M does business throughout the United States, including in New York. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS, including PFOA and PFOS, and/or PFAS Products throughout the United States, including in New York.

14.     **Defendant Dyneon LLC** ("Dyneon") is a subsidiary of 3M and is Delaware corporation with its principal place of business in Oakdale, Minnesota. Dyneon does business throughout the United States, including in New York, and in various other countries. At all relevant times, Dyneon marketed, promoted, distributed, developed, manufactured, distributed, released, trained users, produced instructional materials, and/or sold certain PFAS and/or PFAS Products, including in New York.

15.     **Defendant E.I. du Pont de Nemours & Company** ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont does business throughout the United States, including in New York. DuPont marketed, promoted, distributed, developed, manufactured, distributed, released, trained users, produced instructional materials, and/or sold certain PFAS and/or PFAS Products, throughout the United States, including in New York.

16.     **Defendant The Chemours Company** ("Chemours") is a Delaware corporation with its principal place of business in Wilmington, Delaware. In 2015, DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. Chemours was incorporated as a subsidiary of DuPont until approximately April of 2015.  In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company. As part of this spinoff, Chemours assumed certain environmental liabilities associated with Dupont's historical business lines, including those related to PFAS.  DuPont and Chemours, as alleged in detail below, fraudulently conveyed the assets and liabilities of DuPont in this spin-off.  Chemours has filed a complaint against Dupont in the Delaware Chancery Court seeking declaratory relief related to the allocation of various environmental liabilities. Since its inception, Chemours marketed, promoted, distributed, developed, manufactured, distributed, released, trained users, produced instructional materials, and/or sold certain PFAS and/or PFAS Products, including in New York.

17.     Defendants DuPont and Chemours are collectively referred to herein as the "DuPont Defendants"

18.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

19.     All references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## III.     Jurisdiction and Venue

20.     The United States District Court for the Eastern District of New York has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum of $75,000.

21.     This Court has jurisdiction over Defendants because, based on information and belief, each Defendant has sufficient minimum contacts in New York or otherwise intentionally avails itself of the New York market either through the distribution or sale of products containing or that degrade to PFOA and/or PFOS in the State of New York so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice. Each Defendant is a corporation or other business authorized to do business in New York and registered with the New York Secretary of State.

22.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and harms giving rise to this case occurred, or a substantial part of the property that is the subject of this action is situated, in the Eastern District of New York.

## IV.     Factual Allegations

### A.     PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory Standards

23.     PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals

is entirely manmade and does not occur in nature. PFOA and PFOS are among the most toxic chemicals in the PFAS family.

24.     PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they are soluble and do not adsorb (stick) to soil particles, they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

25.     PFOA and PFOS bioaccumulate and biomagnify in people and other organisms.

26.     Scientists link PFOA and PFOS with a wide range of serious public health impacts.

27.     PFOA and PFOS contamination presents a serious threat to public health through drinking water.

28.     PFOA and PFOS enter the environment from industrial facilities that manufacture PFAS Products. PFOA and PFOS releases to land and water from a multitude of industrial sites are known pathways to the environment. PFOA and PFOS may also enter the environment when released from PFOA- or PFOS-containing consumer and commercial products during their use and disposal.

29.     On April 26, 2017, Governor Cuomo signed the Clean Water Infrastructure Act, a $2.5 billion investment in drinking water infrastructure, clean water infrastructure, and water

quality protection across New York. The legislation requires all New York-based water systems to test for PFOA and PFOS contamination.[2]

30.     In September 2017, Governor Cuomo announced his appointees for a 12-member Drinking Water Quality Council tasked with ensuring all New Yorkers have access to safe and clean drinking water. The Council's initial responsibility was to recommend enforceable Maximum Contaminant Levels ("MCLs") for PFOA and PFOS as priority emerging New York contaminants that remain unregulated by the federal government.[3]

31.     In December 2018, the Drinking Water Quality Council recommended that the New York Department of Health adopt MCLs for PFOA and PFOS of 10 parts per trillion ("ppt"),[4] rendering enforcement imminent.

32.     In July 2019, Governor Cuomo announced that the New York Department of Health planned to adopt the recommended MCLs for PFOA at PFOS at 10 ppt for each compound.  The public comment period is underway, and the MCLs are expected to become enforceable without change.  Enforcement is imminent.[5]

---

[2] Press Release, New York State, Governor Cuomo Signs Legislation Investing $2.5 Billion in Clean Water Infrastructure and Water Quality Protection (Apr. 26, 2017), *available at* https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-investing-25-billion-clean-water-infrastructure-and-water.

[3] Press Release, New York State, Cuomo Announces Appointees to Drinking Water Quality Council to Safeguard New York Drinking Water Supplies, (Sep. 22, 2017), *available at* https://www.governor.ny.gov/news/governor-cuomo-announces-appointees-drinking-water-quality-council-safeguard-new-york-drinking.

[4] Press Release, New York State, Drinking Water Quality Council Recommends Nation's Most Protective Maximum Contaminant Levels for Three Unregulated Contaminants in Drinking Water (Dec. 18, 2018) *available at* https://www.health.ny.gov/press/releases/2018/2018-12 18_drinking_water_quality_council_recommendations.htm.

[5] Press Release, Governor Cuomo Announces Availability of $350 Million for Water System Upgrades Statewide and Directs Health Department to Begin Adopting Maximum Contaminant Levels for PFOA, PFOS, and 1,4-Dioxane (July 8,2019), *available at* https://www.governor.ny.gov/news/governor-cuomo-announces-availability-350-million-water-system-upgrades-statewide-and-directs.

33.     The establishment of health-based MCLs triggers certain State regulatory requirements governing the Village's wells and operations; in some circumstances action is required even if levels contamination levels are below the MCL to protect against MCL exceedances. Such State requirements include, but are not limited to, required investigatory and remedial action by public water suppliers to protect public health, including by taking action to remove PFAS contamination from water in its wells

**B.      Defendants' Production of PFAS Products**

34.     PFOA and PFOS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

35.     For most of the past several decades, 3M has been the primary manufacturer of PFOA and PFOS.

36.     3M began producing PFOA and PFOS as raw materials that it used to produce other products, or that it sold to third parties for use in other products. 3M produced PFOA and PFOS by electrochemical fluorination in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS. 3M went on to market several PFOA and PFOS Products, including its Scotchguard brand of stain repellant, food packaging, textile treatments, fluorosurfactants and additives, and others. 3M ceased PFOA production in 2002 under pressure from the U.S. EPA.

37.     DuPont began production for sale of polytetrafluoroethylene ("PTFE"), a fluoropolymer, in or around 1951. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (i.e. a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water or oil; a lubricant; a coating for catheters and other medical equipment; an oxidizer in flares; in dental fillings; and

many others. DuPont has produced and produces numerous other PFOA and PFOS Products. DuPont also began producing PFOA as a raw material for its own use and for sale in or around 2002, after 3M ceased PFOA production.

       **C.**    **Defendants' Knowledge of Threats Posed by Their PFAS Products**

       38.    For more than 50 years, Defendants were or should have been aware of the dangers posed to people by exposure to their PFOA and PFOS products (including via drinking water); and that the production and use of PFOA and PFOS products resulted in the release of PFOA and PFOS to the environment. Despite this knowledge, Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public; and continued their PFOA and PFOS production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of their products. These measures could have eliminated or reduced damage and injuries to the Village's drinking water production wells.

       39.    By 1956, PFAS from 3M's products were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

       40.    3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped into landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

       41.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

       42.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

43.     By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

44.     By at least 1970, 3M was aware that its PFAS products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

45.     In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

46.     As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

47.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. DuPont was aware of 3M's findings no later than 1981.

48.     Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFAS, DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

49.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

50.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own scientists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

51.     In 1981, DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

52.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

53.     DuPont was long aware it was releasing from its facilities PFAS that were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont in 1984 held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either, despite knowing of PFOA's toxicity.

54.     During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use, and had "no incentive to take any other position."

55.     In 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

56.     By at least 1993, Defendants were aware that PFAS was linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

57.     Despite its understanding of the hazards associated with its PFAS Products, 3M actively sought to suppress scientific research on the hazards associated with those products, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health and ecological risks of its PFAS products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFCs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

58.     In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these

chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

59.     All Defendants knew or should have known that in their intended and/or common use, their PFAS Products would very likely injure and/or threaten public health and the environment. This knowledge was accessible to all Defendants.

**D.     Major Sources of PFAS in the Environment**

60.     Manufacturing facilities where Defendants' PFOA and PFOS Products are synthesized and made into products or chemical feedstocks, or where PFOA and PFOS are used as processing aids, as well as secondary manufacturing facilities where PFOA and PFOS Products such as PTFE are applied to other products, are major PFOA and PFOS release sites. Industries that are known sources of PFOA and PFOS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFOA and PFOS releases at industrial sites are generally due to direct wastewater discharge, as well as accidental releases such as leaks or spills.

61.     There are several current and former industrial sites near the Village's wells or located in the vicinity of sources of the Village's water supply that are likely to have contributed to the release of PFOA and PFOS from Defendants' PFAS Products, and consequent contamination of the Village's wells.

62.     Landfills receive industrial waste, sewage sludge, waste from site mitigation, and PFAS-bearing consumer goods. PFAS in landfills and former landfills can leach from these wastes into ground and surface water. PFAS may also be released from landfills in fugitive dust or directly

to the atmosphere. Landfills constructed before 1990 that received industrial and construction waste deposits have a higher potential for contributing to PFAS releases because they were not required to be constructed with flexible membrane liners or other leachate control measures. Nationwide studies in the United States, as well as Canada and Europe, have shown high levels of PFAS in landfill leachate. The climatic conditions in New York are particularly suited for the generation of leachate, and the hydrogeologic setting makes groundwater highly vulnerable to PFAS impacts from leachate.

63.     There are several current and former landfills near the Village's wells or located in the vicinity of sources of the Village's water supply that are likely to have contributed to the release of PFOA and PFOS from Defendants' PFAS Products, and consequent contamination of the Village's wells.

64.     Municipal and industrial wastewater treatment plants are also repositories for industrial and consumer items containing PFAS. These facilities provide multiple pathways for PFAS from industrial and consumer items to contaminate groundwater, surface water, or both, including by point source discharges of effluent; leakage or unintended releases from sewerage or surface impoundments; air emissions; or disposal of biosolids or other byproducts generated during the treatment process.

**E.     The Village Is Injured.**

65.     PFOA and PFOS have been detected in varying amounts at varying times in the Village's wells, including at levels that have compelled the Village to take responsive actions. In addition, PFOA and PFOS's high mobility and persistence in soil and groundwater means they will likely continue to spread and affect even more of the Village's wells in the future.

66.     Defendants' PFOA and PFOS products are the major sources of the PFOA and PFOS released to the environment that ultimately reached groundwater that supplies the Village's

production wells. PFOA and PFOS have reached those wells due to the routine, foreseeable, and intended use and disposal of Defendants' PFOA and PFOS products in the vicinity of locations from which the Village's obtains water, including its groundwater wells. Such use, disposal, and environmental transport has brought PFOA and PFOS to the Village's wells from releases at a myriad of diffuse sources such as industrial and manufacturing facilities and businesses; locations where PFAS-contaminated water is used for irrigation; sites where consumer products are disposed; and others.

67.     To address PFOA and PFOS contamination in its wells, the Village's has, *inter alia*, incurred expenses in developing plans to address PFOA and PFOS in a subset of its wells, including by planning to add or reconfigure wellhead treatment. the Village anticipates taking these and additional steps to address the continuing and future PFOA and PFOS contamination in its wells attributable to Defendants' tortious conduct.

**F.     Treatment of PFAS**

68.     The most viable technologies to remove PFAS compounds from drinking water are granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. Each of these technologies is extremely expensive to build, install, operate and maintain.

**G.     Illegal Transfers Between the DuPont Defendants**

69.     In approximately early 2014, DuPont formed Chemours as a wholly-owned subsidiary. Chemours had a separate board of directors, but that board was controlled by DuPont.

70.     In July of 2015, DuPont transferred its "performance chemicals" business to Chemours. This transfer included at least titanium technologies, fluoroproducts, and chemical solutions.

71.     In addition to the transfer of assets of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.

72.     The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities—which were known by DuPont to be massive—and Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

73.     At the time of DuPont-Chemours transfer, the performance chemicals business held an estimated debt of approximately $4 billion.

74.     At this time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

75.     Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from its performance chemicals business, with no time limitation. This indemnification apparently remains uncapped. Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further  agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based

on an determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

76.     Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

77.     At the time of the DuPont-Chemours spin-off in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

78.     Until the completion of the spinoff, Chemours was a wholly-owned subsidiary of DuPont, and even though Chemours had a separate board, the board was controlled by DuPont. After the spin-off, new members of Chemours board were appointed. The spin-off and related decisions were conducted while the board was controlled by DuPont. The new Chemours board did not take part in the separation.

79.     DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act—related to its PFAS compounds. Although seemingly small, this was the largest such penalty in history at the time it was levied.

80.     Relatedly, and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, causing thousands of people to receive serious medical diagnoses attributable to DuPont's chemicals, including cancer.

81.     In 2016, Chemours itself acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

82.     Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement up to the following five years.

83.     At the time of the DuPont-Chemours spin-off, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

84.     The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive the public and investors. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liability for the claims that arise out of this case.

## V.    Causes of Action

### FIRST CAUSE OF ACTION
### Strict Products Liability for Defective Design
### (Against All Defendants)

85.     Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

86.     As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of PFAS Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

87.     Defendants knew that third parties would purchase their PFAS Products and use them without inspection for defects.

88.     PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of Plaintiff's drinking water production wells. Such discharges occurred at various locations, at various times, and in various amounts.

89.     Defendants' PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

90.     Defendants knew or reasonably should have known that the use of their PFAS Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS onto land or into water.

91.     The PFAS Products used and/or disposed of in the vicinity of Plaintiff's drinking water production wells were defective in design and unreasonably dangerous because, among other things:

    a.  PFOA and PFOS cause extensive and persistent groundwater contamination when they, or products containing or degrading to them, are used in their foreseeable and intended manner.

    b.  PFOA and PFOS contamination in drinking water poses significant threats to public health and welfare.

      c.    Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFOA and PFOS.

92.    At all times relevant to this action, Defendants' PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

93.    Defendants knew or should have known about feasible alternatives to their PFAS Products without the use of PFOA or PFOS, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

94.    As a direct and proximate result of the defects previously described, several of Plaintiff's wells have been, and continue to be, contaminated with PFOA and PFOS in varying amounts over time, causing Plaintiff significant injury and damage.

95.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

96.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of drinking water wells. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests

an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

97.     Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## SECOND CAUSE OF ACTION
### Strict Products Liability for Failure to Warn
### (Against All Defendants)

98.     Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

99.     As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of PFAS Products, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of their products that Defendants knew or should have known about.

100.     Defendants knew that third parties would purchase PFAS Products and use them without inspection for defects.

101.     PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of Plaintiff's drinking water production wells.

102.     The PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

103.     Defendants knew or should have known that the use of PFAS Products in their intended manner would result in the discharge, disposal, or release of PFOA and PFOS onto land or into water.

104. The PFAS Products used in the vicinity of Plaintiff's drinking water production wells were defective in design and unreasonably dangerous products for the reasons set forth above.

105. Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of PFAS Products in the vicinity of Plaintiff's drinking water production wells, including contamination of public drinking water wells with PFOA and PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

106. In particular, Defendants failed to describe such hazards or provide adequate precautionary statements regarding such hazards in the labeling of their products containing PFOA and PFOS or otherwise.

107. As a direct and proximate result of Defendants' failure to warn of the hazards posed by disposal or release of PFAS Products in the vicinity of subterranean public drinking water wells that were, or reasonably should have been, known to them, PFOA and PFOS contaminates several of Plaintiff's wells in varying amounts.

108. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

109. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of drinking water wells. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct

and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

110.   Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

### THIRD CAUSE OF ACTION
### Negligence
### (Against All Defendants)

111.   Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

112.   As commercial manufacturers, sellers, distributors, suppliers, marketers, and/or designers of PFAS Products, Defendants owed a duty of care to Plaintiff not to place into the stream of commerce products that were in a defective condition and unreasonably dangerous to drinking water in Plaintiff's service area.

113.   Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing such unreasonably dangerous PFAS Products into the stream of commerce, including in the Village's service area, even when they knew or should have known about the dangers PFOA and PFOS posed to drinking water wells.

114.   As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

115.   Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of drinking water wells. Defendants committed each of the above-described acts and omission knowingly,

willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

116.     Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

**FOURTH CAUSE OF ACTION**
**Public Nuisance**
**(Against All Defendants)**

117.     Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

118.     The Village provides drinking water from its wells to residents and businesses for drinking, bathing, cleaning, washing, and other uses.

119.     Because the Village is a public entity, the water it provides to those residents and businesses is a public or commonly held resource. Members of the public have a right to have their water remain clean and potable, free of contamination by toxic man-made compounds.

120.     Defendants' acts and omissions, including their manufacture, promotion, marketing, sale, distribution, supply, defective design of, and/or failure to warn regarding PFOA and PFOS in their products, contaminated the Village's wells, rendering water served from them a public health hazard and unfit for human consumption.

121.     Consequently, Defendants substantially interfered with and caused damage to a public or common resource that endangered public property, as well as the health, safety, and comfort of a considerable number of persons. Such action creates, contributes to, or maintains a public nuisance.

122.     As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

123.     As an owner of water production wells and purveyor of drinking water, Plaintiff suffers injuries different in kind from the community at large because it relies entirely upon its groundwater production wells for its public service functions.

124.     Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of drinking water wells. The Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

125.     Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

### FIFTH CAUSE OF ACTION
**Trespass**
**(Against All Defendants)**

126.     Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

127.     Plaintiff owns and possesses its drinking water production system, including drinking water production wells that extract groundwater in Plaintiff's service area.

128.     Plaintiff actually and actively exercises its rights to appropriate and use groundwater drawn from its wells.

129.    Plaintiff did not give any Defendant permission to cause PFOA or PFOS to enter its groundwater wells.

130.    Defendants knew or reasonably should have known that PFOA and PFOS have a propensity to infiltrate groundwater aquifers when released to the environment; are mobile and persistent groundwater contaminants capable of moving substantial distances within aquifers; are toxic to human health; and are therefore hazardous to drinking water systems and human health.

131.    Defendants manufactured, promoted, marketed, distributed, and/or sold PFOA and PFOS Products, which Defendants knew or reasonably should have known would virtually certainly be discharged and release toxic PFOA and PFOS into the ground and sewer system, and intrude upon, contaminate, and damage Plaintiff's possessory interest.

132.    Defendants' conduct constitutes a continuing unauthorized intrusion and a continuing trespass onto Plaintiff's property.

133.    Each Defendant is a substantial factor in bringing about the contamination of Plaintiff's wells, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiff.

134.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

135.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct

and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

136.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

**SIXTH CAUSE OF ACTION**
**Fraudulent Conveyance—Violation of New York's Debtor & Creditor Law**
**("NYDCL")**
**(Against the DuPont Defendants)**

138.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

139.    Plaintiff seeks all relief available under NYDCL for the Dupont Defendants' violations of the NYDCL for their fraudulent conveyances as part of the DuPont-Chemours transactions. Pursuant to the NYDCL, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NYDCL § 273.

140.    The NYDCL also makes a conveyance fraudulent where it is "made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him" and is "without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." NYDCL § 273a.

141.    Sections 274 through 276 of the NYDCL also defines the following fraudulent conveyances:

27

    a.   "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NYDCL § 274.

    b.   "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." NYDCL § 275.

    c.    "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NYDCL § 276.

142.   The DuPont Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or collect a judgment to which they are or will be owed. As a result of the DuPont Defendants' acts, omissions and other conduct described herein, Plaintiff has been damaged.

143.   At all relevant times, the DuPont Defendants have acted with actual intent to hinder, delay and defraud parties, and/or without receiving a reasonably equivalent value in exchange for the transfer obligation, and they were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due.

144.     For decades, DuPont manufactured, marketed, distributed and/or sold PFAS and/or PFAS Products with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would impact groundwater, Plaintiff's drinking water supply wells.

145.     As a result of the transfer of assets and liabilities described herein, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution and/or sale of PFAS and/or PFAS Products.

146.     At the time of the transfer of its performance chemical business to Chemours, DuPont had been sued, had notice of suits and/or had knowledge of likely litigation regarding DuPont's liability from the manufacture, marketing, distribution, and/or sale of PFAS and/or PFAS Products.

147.     The DuPont Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay when they became due.

148.     The claims, judgment and potential judgments against Chemours potentially exceed its ability to pay.  Accordingly, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought herein and to the DuPont Defendants liable for any damages or other remedies that may be awarded by the Court or jury arising from this complaint. Plaintiff further seeks all other rights and remedies that may be available to it under NYDCL, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## VI.    Prayer for Relief

Plaintiff Incorporated Village of Garden City prays for judgment against Defendants, jointly and severally, awarding Plaintiff:

     a.  Compensatory damages in an amount according to proof;

     b.  Punitive damages in an amount to be determined at trial;

     c.  Injunctive and equitable relief, including in the form of a fund to abate the nuisance and trespass;

     d.  All appropriate declaratory relief, including voiding any transfers to the extent necessary to cover a judgment in this case;

     e.  Plaintiff's costs in prosecuting this action, including reasonable attorneys' fees, court costs, expert fees, and other expenses of litigation;

     f.  Pre-judgment interest and post-judgment interest; and

     g.  All other relief this Court deems just, proper, and equitable.

## VII.    Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury of all claims asserted in this Complaint.

Dated: August 9, 2019       Respectfully submitted,

        */s/ Matthew K. Edling*
        Matthew K. Edling

        VICTOR M. SHER (*pro hac vice* application to be submitted)
        vic@sheredling.com
        MATTHEW K. EDLING
        matt@sheredling.com
        STEPHANIE D. BIEHL (*pro hac vice* application to be submitted)
        stephanie@sheredling.com
        KATIE H. JONES (*pro hac vice* application to be submitted)
        katie@sheredling.com

TIMOTHY R. SLOANE (*pro hac vice* application to be submitted)
tim@sheredling.com
**SHER EDLING LLP**
100 Montgomery St. Suite 1410
San Francisco, CA 94104
(628) 231-2500

PETER FISHBEIN
**BEE READY FISHBEIN HATTER & DONOVAN, LLP**
170 Old Country Road
Mineola, New York 11501
(516) 746-5599
pfishbein@beereadylaw.com

*Attorneys for Plaintiff Incorporated Village of Garden City*